**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| GRIDSCALE SOLUTIONS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| THE AES CORPORATION and FLUENCE ENERGY, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which plaintiff GridScale Solutions, LLC ("GridScale" or "Plaintiff") makes the following allegations against defendants The AES Corporation ("AES") and Fluence Energy, Inc. ("Fluence") (collectively, "Defendants"):

## NATURE OF THE ACTION

1. This is a civil action for infringement of U.S. Patent No. 8,796,884 (the "'884 patent"), U.S. Patent No. 8,279,642 (the "'642 patent"), U.S. Patent No. 8,842,454 (the "'454 patent"), and U.S. Patent No. 10,516,270 (the "'270 patent") (collectively, the "Asserted Patents") arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.* Copies of the Asserted Patents are attached hereto as Exhibits 1-4.

2. More specifically, this case is about Defendants' infringement of the Asserted Patents through their grid-scale energy systems, including, but not limited to, the Luna Battery Storage Project and the Lancaster Area Battery (LAB) energy storage system. *See, e.g.*, https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

**THE PARTIES**

3.      GridScale is a Texas limited liability company with a principal place of business in Plano, Texas.

4.      GridScale owns patents covering foundational technologies, including the patents asserted in this case, that pertain to renewable energy and grid-scale battery energy storage systems.

5.      GridScale holds all substantial rights and interest in the Asserted Patents, including the exclusive right to sue Defendants for infringement and recover damages.

6.      Defendant AES (designated in Virginia as Applied Energy Services, Inc.) is a Delaware corporation, with its principal place of business and corporate headquarters at 4300 Wilson Boulevard, Arlington, Virginia 22203, within this District. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0000874761/000087476126000063/aes-20251231.htm (AES's Form 10-K filing for the fiscal year ending December 31, 2025). AES maintains a regular and established place of business in this District through permanent physical facilities comprising its corporate headquarters. *Id.* On information and belief, AES owns and/or leases property in Arlington, Virginia for its headquarters and executive operations.

7.      Defendant Fluence (designated in Virginia as Fluence Energy, Inc. of Delaware) is a Delaware corporation, with its principal place of business and corporate headquarters at 4601 Fairfax Drive, Suite 600, Arlington, Virginia 22203, within this District. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001868941/000186894125000081/flnc-20250930.htm (Fluence's Form 10-K filing for the fiscal year ending September 30, 2025). Fluence maintains a regular and established place of business in this District through permanent physical facilities comprising its corporate headquarters. *Id.* On information and belief, Fluence owns and/or leases property in Arlington, Virginia for its headquarters and executive operations.

8.      Fluence Energy, Inc. ("Fluence") conducts its operations through Fluence Energy,

LLC, an entity originally established in January 2018 as a joint venture between indirect subsidiaries of AES and Siemens AG. Following its initial public offering in November 2021, Fluence was restructured as a holding company whose sole material assets are the limited liability company interests in Fluence Energy, LLC. Fluence Energy, Inc. identifies Fluence Energy, LLC as a direct or indirect subsidiary. *See, e.g.*, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001868941/000186894125000081/flnc-20250930.htm (SEC filing stating "Fluence Energy, Inc. and all of its direct and indirect subsidiaries, including Fluence Energy, LLC").

9.      On information and belief, Fluence maintains a deeply intertwined structural and commercial relationship with AES and AES wields significant governance influence over Fluence, while simultaneously operating as one of Fluence's primary strategic partners and largest commercial customers for grid-scale energy storage systems. *See, e.g.*, https://fluenceenergy.com/about/our-story/. Furthermore, Fluence identifies, markets and holds itself out to the world as an "AES Company." *See, e.g.*, https://fluenceenergy.com/. Fluence states that it is backed by, for example, its "parent" company AES "to deliver the scale and staying power our customers can rely on." https://fluenceenergy.com/about/our-story/. On information and belief, AES has control over Fluence.

10.     On information and belief, Defendants also possess an intertwined structural, commercial, and operational relationship with respect to the Accused Products deployed at exemplary representative projects identified in this action. For example, Fluence designs, manufactures, supplies, configures, and provides ongoing operational support for the Accused Products—including the Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, and Sunstack™ platforms—that AES deploys, operates, and commercializes at specific grid-scale energy storage projects in the United States, including the Luna Battery Storage project and the Lancaster Area Battery project. The alleged infringement, for example, includes and arises from

the same integrated supply, deployment, and operation of the same specific Accused Products at those projects, and common questions of fact, including the design, architecture, configuration, and operation of the Accused Products at those specific projects, will arise as to both Defendants in this action.

11. Defendants have committed and continue to commit acts of patent infringement of the Asserted Patents including by making, using, selling, offering for sale, and/or importing infringing apparatuses and systems and performing infringing methods.

12. Defendants currently benefit from and have benefited greatly from GridScale's innovations.

## JURISDICTION AND VENUE

13. This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §§ 101 *et seq.*

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15. This Court has specific and general personal jurisdiction over Defendants consistent with the requirements of the Due Process Clause of the United States Constitution and the Virginia Long-Arm Statute. Va. Code Ann. § 8.01-328.1. On information and belief, each Defendant has sufficient minimum contacts with the forum because each Defendant transacts substantial business in the Commonwealth of Virginia and in this District.

16. Defendant AES has substantial contacts with this forum as a consequence of actively establishing and maintaining its headquarters and principal place of business in Virginia and in this District, and AES conducts substantial business in Virginia. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0000874761/000087476126000063/aes-20251231.htm (AES's Form 10-K filing for the fiscal year ending December 31, 2025). AES sells,

makes, uses, offers for sale, and/or imports its products and services, including products and services that infringe the Asserted Patents, within the Commonwealth of Virginia, including to customers in Virginia. *See id.* For example, AES operates several renewable generation facilities in the Commonwealth of Virginia, including Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft). *See id.*

17. Defendant Fluence has substantial contacts with this forum as a consequence of actively establishing and maintaining its headquarters and principal place of business in Virginia and in this District, and Fluence conducts substantial business in Virginia. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001868941/000186894125000081/flnc-20250930.htm (Fluence's Form 10-K filing for the fiscal year ending September 30, 2025). Fluence sells, makes, uses, offers for sale and/or imports its products and services, including products and services that infringe the Asserted Patents, within the Commonwealth of Virginia, including to customers in Virginia. *See id.*

18. Defendants have committed and continue to commit acts of patent infringement, including by making, using, selling, offering for sale, and/or importing into the United States, and within this District, products and services, such as, for example, grid-scale energy systems deployed and operated by AES in the United States, including systems integrated and supplied by Fluence Energy (e.g., Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, Sunstack™, and associated Fluence Cube–based BESS platforms operating in AES U.S. energy storage projects such as, but not limited to, Luna and Lancaster Area Battery (LAB), Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft).

19. Each Defendant employs personnel in this District who are engaging in activities

that give rise to this action.

20. Each Defendant has purposefully availed itself of the privilege of conducting business in this District.

21. Given the foregoing, the exercise of jurisdiction over each Defendant does not offend traditional notions of fair play and substantial justice.

22. Venue is proper for AES in this District under 28 U.S.C. §§ 1391(b) and (c), and 1400(b) because, as described above, a substantial part of the events giving rise to GridScale's claims occurred in this District, and because AES, with its headquarters in Arlington, VA, resides within this District. AES has a regular and established place of business within this District with employees in this District and transacts business within the District regularly.

23. Venue is proper for Fluence in this District under 28 U.S.C. §§ 1391(b) and (c), and 1400(b) because, as described above, a substantial part of the events giving rise to GridScale's claims occurred in this District, and because Fluence, with its headquarters in Arlington, VA, resides within this District. Fluence has a regular and established place of business within this District with employees in this District and transacts business within the District regularly.

<strong><u>THE ASSERTED PATENTS</u></strong>

**A. Overview of the Asserted Patents**

24. The Asserted Patents were developed based on inventions of Enphase Energy, Inc. ("Enphase") and were eventually assigned to GridScale. Founded in 2006 by Martin Fornage and Raghu Belur, Enphase is a pioneer in miniaturizing the complex electronics of a high-power inverter into a device that could survive the harsh conditions of a rooftop for 25 years. https://markets.financialcontent.com/stocks/article/finterra-2026-2-5-powering-the-future-a-deep-dive-analysis-of-enphase-energy-enph-in-2026.

25.    Enphase's relentless pursuit of reliability and "power saving" (efficiency) necessitated a complete reimagining of power electronics, as evidenced by the innovations found in the Asserted Patents.

26.    A primary technical hurdle in Enphase's early history was the inverter reliability gap. Inverters are "one of the most important pieces of equipment in a solar energy system," as well as battery energy storage systems. *See, e.g.*, https://www.energy.gov/cmei/systems/solar-integration-inverters-and-grid-services-basics. Traditional inverters relied on electrolytic capacitors to manage the ripple between steady DC input and pulsating AC output. As noted in the '884 and '642 patents, these components were historically bulky and prone to failure, often acting as the Achilles' heel of the system.

27.    Enphase's innovation, described in the '884 patent, involved advanced power control and synchronization functions that fundamentally altered the interface between the converter and the source. By using active filtering techniques (as seen in the '642 patent) to reduce double-frequency ripple on the DC bus, Enphase was able to utilize smaller, more reliable film capacitors. This technical leap not only improved the lifespan of the hardware but also significantly reduced the ripple power that would otherwise reduce the efficiency of the photovoltaic (PV) cells.

28.    As Enphase scaled its technology from individual units to utility-scale deployments, the technical challenge shifted to optimizing system-wide efficiency. The '454 patent represents a technological breakthrough in hierarchical control architecture. By claiming an array of inverters where each unit is coupled to a specific subset of photovoltaic cells and orchestrated via a master/secondary controller relationship, the patented invention overcame conventional limitations in managing environmental variability.

29.    The distributed, intelligent architecture of these microinverters ensures a balanced, high-quality power output that meets utility grid requirements. This distributed intelligence

7

fundamentally defined Enphase's technological contributions, turning a collection of independent hardware into a unified, high-efficiency power generation facility.

30.     As Enphase expanded its technological focus to include grid-agnostic resilience, it identified critical flaws in conventional microgrid operation. Specifically, the '270 patent addresses the inherent instabilities, such as rapid, oscillatory generator cycling caused by frequency fluctuations, that plague traditional droop control methods when a microgrid operates as an intentional island. To overcome these prior art deficiencies, the '270 patent claims an architecture with a novel hysteretic droop curve utilizing staggered shut-down and turn-on thresholds. This patented architecture delivers the autonomous stability necessary for modern microgrids, ensuring a seamless transition to backup power while preventing the hardware degradation and reliability failures characteristic of conventional systems.

31.     Collectively, the Asserted Patents represent a fundamental shift in energy management, moving beyond incremental efficiency to the systematic elimination of technical friction within prior art systems. By claiming the removal of failure-prone hardware (the '884 patent), disclosing an optimized DC bus architecture (the '642 patent), advancing hierarchical controller logic (the '454 patent), and securing autonomous microgrid stability (the '270 patent), Enphase resolved the industry's most expensive and unreliable challenges. GridScale's patents fundamentally benefit from this pioneering innovation, utilizing foundational control logic as the bedrock for its own advanced technological portfolio.

32.     As of December 31, 2024, Enphase's intellectual property estate included approximately 295 issued U.S. patents and 110 international patents, comprising a broader footprint of over 701 issued patents and pending applications worldwide. Enphase secured a formidable global patent portfolio, a portion of which has now been transferred to GridScale. The

four Asserted Patents result from the pioneering intellectual property developed by Enphase and its significant, sustained investment in energy management research and development.

**B.      U.S. Patent No. 8,796,884**

33.      The '884 patent, entitled "Energy Conversion Systems with Power Control," lawfully issued on August 5, 2014. A true and correct copy of the '884 patent is attached as Exhibit 1.

34.      The '884 patent names Ravindranath Naiknaware, Vincenzo DiTommaso, Triet Tu Le, Robert D. Batten, and Terri Shreeve Fiez as inventors.

35.      GridScale owns by assignment the entire right and title in and to the '884 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

36.      The written description of the '884 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

37.      The '884 patent claims are directed to addressing problems specific to particular power systems that transfer power from an energy source such as solar panels, batteries, and fuel cells to electric power distribution systems, such as local and regional power grids. '884 patent at 1:16-21. In particular, prior systems tended to be "expensive, bulky, unreliable, and inefficient," which impeded adoption of alternative energy sources and backup-power systems. *Id.* at 1:48-60.

38.      The '884 patent provides background information about the design constraints and considerations when designing a converter that converts direct-current (DC) power to alternating-current (AC) power. As the patent explains, "[m]ost power grids operate on AC current at a line

(or mains) frequency of 50 to 60 cycles per second (Hertz or Hz). Power in an AC grid flows in a pulsating manner with power peaks occurring at twice the line frequency, i.e., 100 Hz or 120 Hz," whereas "many energy sources supply DC power in a steady manner." *Id.* at 1:22-27. As a result, "a power conversion system for transferring power from a DC source to an AC grid typically includes some form of energy storage to balance the steady input power with the pulsating output power." *Id.* at 1:27-31. Figure 2 of the '884 patent, which is reproduced below, depicts "a conventional system for converting DC power from a photovoltaic (PV) panel to AC power. *Id.* at 3:39-40.



FIG.2

*Id.* at Fig. 2.

39.    The conventional system depicted in Figure 2 of the '884 patent includes a DC link capacitor $C_{DC}$ and a decoupling capacitor $C_1$, either or both of which can provide energy storage to balance the energy requirements of AC power with the steady production of DC power. *See id.* at 3:49-53. Absent sufficient energy storage by those capacitors, power pulses from the DC-to-AC conversion would transfer back to the DC energy source (e.g., solar panel or battery) in the form of ripples. *See id.* at 3:56-62. The issue, however, is that the design of conventional systems necessitates large capacitance values, which "are usually prohibitively expensive" unless electrolytic capacitors are used. *See id.* at 3:63-4:1. But electrolytic capacitors introduce their own shortcomings because they "have limited life spans and tend to have a high failure rate." *Id.* at

4:57-58. Moreover, "electrolytic capacitors tend to be bulky, heavy and fragile, and have a large equivalent series resistance (ESR)." *Id.* at 4:62-64.

40.     To address the shortcomings of conventional systems, the '884 patent discloses a system and architecture with "power control techniques that may fundamentally alter the dynamics of the interface between a power converter and a power source." *Id.* at 5:20-23. Through that architecture, "the power may be controlled to a dynamic value that may be synchronized with fluctuations in the power demand of a load, with fluctuations in the power supplied by a source, a combination of both, etc." *Id.* at 11:59-62. For example, the '884 patent discloses a controller with a synchronization function to synchronize the modulator to the load and a distortion mitigation function to mitigate distortion in the flow of power to the load. *Id.* at 13:10-14. Figure 21, reproduced below, depicts an example of a distortion mitigation system that includes a controller that implements a synchronization function to synchronize the modulator to the load and a distortion mitigation function to mitigate distortion in the flow of power to the load.



*Id.* at Fig. 21, 2:47-50, 13:36-14:13.

41.     Existing conventional methods and systems required large capacitance values, which in practical application necessitated the use of electrolytic capacitors that introduce undesirable shortcomings into the system. *See id.* at 3:63-4:1, 4:57-58. Moreover, undesirable

ripple remained in conventional designs, even with large capacitors, which resulted in power losses that reduced the efficiency of the system. *Id.* at 5:8-16.

42.    The inventive benefits of the '884 patent over prior solutions stem from the new and novel controller that controls the DC-AC output bridge of the claimed system. Claim 1, for example, recites a converter that transfers power between a source and a load having a fluctuating power demand, the power being delivered to a utility grid. *See id.* at claim 1, Fig. 21, 2:47-50, 13:36-14:13. The claimed controller controls the DC-AC output bridge to generate an AC power output. *See id.* The claimed controller includes a "synchronization function having an input to receive a voltage sensor signal indicative of a grid voltage of the utility grid, the synchronization function configured to generate a phase signal indicative of a phase angle of the voltage sensor signal." *See id.* The claimed controller further includes an architecture where that phase signal is received by a distortion mitigation function, along with "a current sensor signal indicative of a grid current of the utility grid," both of which are used "to generate a magnitude signal" based on the phase signal and the current sensor signal. *See id.* In the claimed controller, a modulator receives the phase signal from the synchronization function and the magnitude signal from the distortion mitigation function, and generates a modulation signal to control the DC-AC output bridge as a function of the received signals. *See id.*

43.    The claims of the '884 patent are directed to a specific, patent-eligible improvement in the physical architecture and operation of power systems. *See id.* at 1:48-60, 3:63-4:1. Specifically, the claimed controller architecture resolves known deficiencies in conventional systems by physically reducing ripple in the input waveform, thereby significantly increasing the efficiency of DC power sources such as photovoltaic panels. *See id.* at 6:52-63. By implementing this specific technical solution, the claimed invention structurally improves the system by eliminating the requirement for failure-prone input electrolytic capacitors and minimizing the

required footprint of the DC link capacitor, providing a concrete technological advantage over the prior art.

44.    The claimed combination of structural features represented a significant technological departure from conventional systems available in February 2009. At the time of the invention, utilizing a controller to command a DC-AC output bridge in the claimed manner was neither known nor in common use. The '884 patent specifically claims a non-conventional system and controller architecture that executes both synchronization and distortion mitigation functions, outputting dedicated phase and magnitude signals to a modulator. By configuring the modulator to control the DC-AC output bridge based strictly on these coordinated signals, the claimed system established a novel, highly specific architecture and operational paradigm.

45.    The claims of the '884 patent are directed to an inventive concept that amounts to significantly more than the mere processing of signals. Specifically, the claims recite a non-conventional hardware architecture that structurally improves the functioning of the power system itself. By successfully reducing the footprint of, or altogether eliminating, the failure-prone capacitors required by conventional prior art systems, the claims resolve a localized technological problem. Considered both individually and as an ordered combination, these claimed features provided an innovative technological solution that was not well-understood, routine, or conventional in the field at the time of the invention. *See* '884 patent at 3:63-5:16.

**C.    U.S. Patent No. 8,279,642**

46.    The '642 patent, entitled "Apparatus for Converting Direct Current to Alternating Current Using an Active Filter to Reduce Double-Frequency Ripple Power of Bus Waveform," lawfully issued on October 2, 2012. A true and correct copy of the '642 patent is attached as Exhibit 2.

47. The '642 patent names Patrick L. Chapman, Brian T. Kuhn, Robert S. Balog, Jonathan W. Kimball, Philip T. Krein, and Alexander Gray as inventors.

48. GridScale owns by assignment the entire right and title in and to the '642 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

49. The written description of the '642 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

50. The '642 patent addresses technical deficiencies unique to power inverters, which serve the critical function of converting direct current (DC) to alternating current (AC). *See* '642 patent at 1:28-33. Prior to the claimed invention, conventional inverter designs suffered from severe operational inefficiencies driven by the double-frequency portion of power, or ripple, flowing back and forth between the load and the source. *See id*. at 1:47-57.

51. The '642 patent provides background information about the tradeoffs inherent in conventional power inverters. *Id.* at 1:37-2:35. As the patent notes, "[o]ne particular application for such power converters is the conversion of DC power generated by an alternative energy source, such as photovoltaic cells ('PV cells' or 'solar cells'), fuel cells, DC wind turbine, DC water turbine, and other DC power sources, to a single-phase AC power for delivery to the AC grid at the grid frequency." *Id.* at 1:41-45. In a single-phase AC power system, the energy flow includes both (i) an average power portion that delivers useful energy from the energy source to the load and (ii) a double-frequency portion that flows back and forth between the load and the source, as described in the following equation:

14

$$p(t)=Po+Po^*\cos(2\omega t+\phi)$$

*Id.* at 1:47-53.

52.   "In applications involving inverters, the double-frequency portion represents undesirable ripple power that, if reflected back into the DC power source in a significant amount, may compromise performance of the source." *Id.* at 1:54-57. The '642 patent recognizes that the undesirable effects of ripple power are especially important in PV cells because the power delivered by the cells varies due to changes in the angle and intensity of sunlight, ambient temperature, and other factors. *Id.* at 1:57-62. PV cells have a maximum power point (MPP), which is the operating point of current and voltage that result in the maximum power output for a given set of conditions of the PV cell. *Id.* at 1:63-67. Undesirable ripple power interferes with the ability of a PV cell to operate at its MPP. *See id.* at 1:67-2:10.

53.   To address the issues associated with conventional inverters, the solution implements a DC bus coupled to an input converter and an output converter, as depicted, for example, in Figure 3, which is reproduced below.



Fig. 3

15

*Id.* at Fig. 3, 7:45-58. An active filter is also coupled to the DC bus, to reduce double-frequency ripple by supplying and absorbing power on the DC bus. *Id.* at 8:44-53.

54.    Existing inverter designs utilized passive filters placed on the input side of the inverter to filter double-frequency power ripple. *Id.* at 8:19-22. Such passive filters include a capacitive device, like an electrolytic capacitor. *Id.* at 8:22-24. "[B]ecause the passive filter is coupled to a low voltage bus, a larger capacitance value is required to achieve a desired amount of stored energy" necessary to provide the desired level of filtering. *See id.* at 8:30-32. "Additionally, because the input bus is a low voltage bus, the change or ripple in the bus is relatively low. As such, the change in energy stored by the passive filter capacitor is relatively low compared to the overall energy storage capability of the passive filter capacitor." *Id.* at 8:38-40.

55.    The '642 patent addresses these burdens with a new and different architecture by implementing an active filter on the DC bus, after the input side of the inverter. *Id.* at Fig. 3, 7:45-58. Because the DC bus "has a relatively higher voltage than the input side, a smaller value of capacitance may be used to store the same amount of energy." *Id.* at 8:35-38. As a result, "the lower capacitance requirement allows the use of alternative capacitor technologies, which are typically lower cost and have increased reliability, such as film capacitors." *Id.* at 8:54-57. The active filter also allows the use of "substantially all of the energy storage capability of the active filter capacitor," which also allows for the use of a smaller capacitor. *Id.* at 8:44-53. These benefits increase the operating efficiency of the inverter by reducing or eliminating losses due to double-frequency ripple. *See id.* at 8:54-65.

56.    The inverters claimed in the '642 patent provide an actively filtered inverter with a non-conventional architecture. Claim 38, for example, recites an inverter that incorporates the inventive concepts described in the '642 patent, including "a direct current (DC) bus," "an input converter electrically coupled to the DC bus, the input converter comprising (i) a transformer

16

having a primary winding and a secondary winding, (ii) a first inverter circuit electrically coupled to the primary winding and configured to convert an input DC waveform to a first alternating current (AC) waveform at the primary winding, the transformer being configured to convert the first AC waveform to a second AC waveform, and (iii) a rectifier circuit electrically coupled to the secondary winding and the DC bus, the rectifier circuit being configured to rectify the second AC waveform to produce a second DC waveform on the DC bus," "an output converter electrically coupled to the DC bus, the output converter comprising a second inverter circuit electrically coupled to the DC bus and configured to convert the second DC waveform to an output AC waveform suitable for delivery to an AC grid; and," "an active filter electrically coupled to the DC bus to reduce a double-frequency ripple power of the second DC waveform by supplying power to and absorbing power from DC power bus to maintain a bus voltage to track a desired bus voltage signal, wherein the active filter comprises a switching circuit coupled to an energy storage device." *Id.* at claim 38. Claim 38 recites the specific architecture, including an active filter on the DC bus after the input side of the inverter, that provides the inventive benefits identified above. *See id.*

57.    The '642 patent claims are directed to a specific new inverter architecture and an improvement to the functioning of inverter hardware, specifically the claimed architecture includes an active filter on the DC bus after the input side of the inverter, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage through a more efficient, more reliable inverter. The claimed inverter is a specific technical implementation that provides a distinct advantage over conventional inverters.

58.    The claimed active filter and claimed combination of inverter components was non-conventional in July 2009. An inverter with an active filter coupled to the same DC bus as an input converter and output converter, where the active filter reduces double-frequency ripple by supplying and absorbing power on the DC bus, was not known let alone widely prevalent or in

common use in 2009. Prior art inverters did not use an active filter on the DC bus and, instead, use a passive filter on the input side. The specific claimed architectural arrangement is what enables, e.g., the use of smaller capacitors and greater reduction in double-frequency ripple.

59.     The claims of the '642 patent are directed to significantly more than merely processing signals. Rather, the claims are directed to a non-conventional architecture for an inverter that (i) better reduces double-frequency ripple and (ii) reduces the size of or eliminates problematic capacitors that were required in conventional architectures, thereby improving the design and functioning of the claimed inverter. The claimed features were therefore innovative and unconventional as they were not known in the prior art. *See* '642 patent at 2:11-24, 8:19-65.

**D.     U.S. Patent No. 8,842,454**

60.     The '454 patent, entitled "Inverter Array with Localized Inverter Control," lawfully issued on September 23, 2014. A true and correct copy of the '454 patent is attached as Exhibit 3.

61.     The '454 patent names Brian Johnson, Phillip Krein, Alexander Gray, and Patrick L. Chapman as inventors.

62.     GridScale owns by assignment the entire right and title in and to the '454 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

63.     The written description of the '454 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

64.     The '454 patent claims are directed to addressing problems specific to inverters that are used to convert direct current (DC) power generated by photovoltaic (PV) cells to alternating

18

current (AC) power, which is used by the utility grid. '454 patent at 1:19-23. The power generated by individual PV cells within an array can vary based on different environmental factors, such as location relative to the sun, shading, changes in the angle and intensity of sunlight, ambient temperature, and other factors. *See id.* at 1:25-28. The patent resolves those problems by providing an array of inverters that are controlled by a plurality of secondary controllers, which are in turn controlled by a primary controller. *See id.* at 1:59-65, 4:21-54, 5:1-26, 7:25-56.

65.     The '454 patent provides background information about the design considerations for inverters, when used with PV cells. *Id.* at 1:17-28. Inverter efficiency is a key factor when used with PV cells. *Id.* at 1:23-25. But the power generated by individual PV cells within an array can vary based on different environmental factors, such as location relative to the sun, shading, changes in the angle and intensity of sunlight, ambient temperature, and other factors. *See id.* at 1:25-28.

66.     Existing systems and methods for inverters coupled to PV cells were inefficient and not capable of maximizing efficiency across an array of PV cells subject to various environmental conditions, while also maximizing array-wide efficiency. *See id.* at 1:17-28, 4:1-54, 6:38-47.

67.     The inventive benefits of the '454 patent over prior solutions primarily stem from its approach of coupling an array of inverters, in which each inverter is coupled to a subset of the PV cells, as well as a master controller. *See id.* at 1:17-28, 1:45-58, 4:1-54, 6:38-47, Fig. 1. In this configuration, the array of inverters and each inverter can provide maximum efficiency for the PV cells to which it is coupled, using, for example, maximum power point tracking (MPPT). *Id.* at 4:1-20, 6:38-47. But the array is also tuned at a system-wide level to, for example, "maintain a system-level energy balance." *Id.* at 4:21-54. These features collectively overcome the inefficiencies, inflexibility, and shortcomings of conventional inverter configurations. *See id.* at 1:17-28, 4:1-54, 6:38-47.

19

68.     The '454 patent claims address those efficiency losses by implementing a specific, architecture for an inverter control system with an array of inverters, in which each inverter is coupled to a subset of the PV cells, as well as a master controller. *See id.* at 4:1-54, 6:38-47. Claim 1, for example, recites a physical apparatus comprising "a plurality of inverters configured to receive direct current (DC) power from a respective DC power source and respectively provide AC power to an AC load," "a primary controller configured to generate a primary control signal based on total AC current and total AC voltage being delivered to the AC load by the plurality of inverters," and "a plurality of secondary controllers configured to each receive the primary control signal and produce a respective secondary control signal based on the primary control signal, wherein the respective secondary control signal for each of the plurality of secondary controllers controls a corresponding one of the plurality of inverters to provide the respective AC power." *Id.* at claim 1. Claim 1's hierarchical architecture with its claimed plurality of inverters, primary controller generating a primary control signal based on measured system-wide AC parameters, and plurality of secondary controllers (each receiving the primary control signal and producing individualized secondary control signals to drive their respective inverters) provides simultaneous optimization at the individual-cell level and system-wide level thereby resolving a concrete technical problem in the physical operation of multi-inverter systems that single-inverter or uncoordinated multi-inverter architectures could not address.

69.     The '454 patent claims are directed to a specific improvement in the functioning of inverters, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by allowing the system to provide maximum efficiency for the PV cells to which the individual inverters are coupled, while also tuning the inverters at a system-wide level. The claimed system is a specific technical implementation that provides a distinct advantage over conventional systems.

70. The systems and methods claimed in the '454 patent provide a non-conventional architecture that maximizes the efficiency of an array of PV cells. The claimed combination of features was non-conventional in November 2010. The use of primary and secondary inverter controllers to both provide maximum efficiency for individual PV cells as well as maintain system-level energy balance was not known, let alone widely prevalent or in common use in 2010. The need for such granular control is driven by the fact that individual PV cells experience different environmental conditions, so system-wide-only control does not maximize the efficiency of individual cells. *See* '454 patent at 1:17-28, 4:1-54, 6:38-47. Prior-art systems were less efficient because, for example, they would utilize a single inverter for the entire array, which could not simultaneously optimize for individual-cell environmental variability and system-wide energy balance. The ordered combination of these claim elements therefore constitutes an inventive concept that amounts to significantly more than any abstract idea. *See* '454 patent at 1:17-28, 4:1-54, 6:38-47.

71. The claims of the '454 patent are directed to significantly more than merely processing signals. Rather, the claims are directed to a non-conventional architecture for a power system that includes both primary and secondary inverter controllers to both provide maximum efficiency for individual PV cells, as well as maintain system-level energy balance, thereby improving the functioning of the claimed power system. The claimed features were therefore innovative and unconventional as they were not known in the prior art.

### E. U.S. Patent No. 10,516,270

72. The '270 patent, entitled "Method and Apparatus for Coordination of Generators in Droop Controlled Microgrids Using Hysteresis," lawfully issued on December 24, 2019. A true and correct copy of the '270 patent is attached as Exhibit 4.

73.    The '270 patent names Donald Richard Zimmanck, Martin Fornage, Michael J. Harrison, and Christopher Rowe as inventors.

74.    GridScale owns by assignment the entire right and title in and to the '270 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

75.    The written description of the '270 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

76.    The '270 patent claims are directed to addressing problems specific to controlling microgrid power generators. '270 patent at 1:18-20. The '270 patent explains that a power system can include a utility, as well as several microgrids coupled to the utility via a utility grid. *Id.* at 2:34-38. Each microgrid can receive energy from the utility grid or supply energy to the grid. *Id.* at 2:38-40. Each microgrid can be capable of operating without energy supplied from the utility, and can cover entities of various sizes, from neighborhoods through cities. *Id.* at 2:44-48. Accordingly, the term "microgrid" does not denote a particular system size. *Id.* Microgrids can operate while disconnected from a conventional utility grid, as an "intentional island." *Id.* at 1:24-29. "Droop control is one technique that may be used for operating energy storage and generation resources in a microgrid that is disconnected from the utility grid." *Id.* at 1:30-32. In droop control, the frequency and/or voltage changes decreases or "droops" in response to increasing electrical load. In droop control, the "droop settings of each microgrid resources may be offset from one another in order to coordinate and optimize the use of the different resources." *Id.* at 1:32-35. For example, in a microgrid containing a conventional generator, distributed energy resource (DER)

generator, and an energy storage device, the droop settings may be set such that "the generator could be set with a lower frequency set point than the storage device so that it doesn't turn on unless the DER generator and energy from the storage device are both being fully used." *See id.* at 1:35-41. Unfortunately, however, "such operation typically leads to instability as generators typically have a minimum power they need to run at and the jump in frequency once the generator turns on would lead to the generator being shut off, thereby causing a frequency drop that results in the generator being turned on again and a continuing oscillation." *Id.* at 1:42-47. This leads to unnecessary oscillation in the supplied power, as well as potential damage to the generator. The '270 patent addresses these limitations by ensuring that the minimum power of the generator (and the associated increase in grid parameter, e.g., frequency) does not cause the generator to shut down. *Id.* at 6:3-7:53, Fig. 2.

77.    To address the shortcomings in controlling microgrid power generators, the patented invention provides a new and improved architecture for a generator controller that implements, for example, a hysteretic droop curve having a shut-down frequency that is higher than the turn-on frequency, where the difference between the shut-down frequency and the turn-on frequency is greater than the expected frequency jump that occurs when the generator is turned on. *Id.* at 6:3-11. The hysteretic droop curve allows the generator to enable and disable energy generation based on measured grid parameters. *Id.* at 6:11-14. Figure 2, reproduced below, depicts an example of the hysteretic droop curve.



*Id.* at Fig. 2.

78.    The inventive benefits of the '270 patent over prior solutions primarily stem from its approach to utilizing a hysteretic droop curve having a shut-down frequency that is higher than the turn-on frequency, where the difference between the shut-down frequency and the turn-on frequency is greater than the expected frequency jump that occurs when the generator is turned on. *Id.* at 6:3-11. These features collectively overcome the inefficiencies and shortcomings of conventional approaches to controlling generation in a microgrid.

79.    The systems and methods claimed in the '270 patent provide an architecture for a generator controller with a hysteretic droop curve having a shut-down frequency that is higher than the turn-on frequency, where the difference between the shut-down frequency and the turn-on frequency is greater than the expected frequency jump that occurs when the generator is turned on. Claim 1, for example, recites a method for autonomously operating a microgrid power generator that incorporates the inventive concepts described in the '270 patent, including "obtaining a first measurement of at least one grid parameter of a microgrid transmission line coupled to a power generator in a microgrid," "comparing the first measurement to a turn-on threshold," "initiating, when the first measurement is less than the turn-on threshold, power generation by the power

generator," "obtaining, after initiation of the power generation, a second measurement of the at least one grid parameter of the microgrid transmission line," "comparing the second measurement to a shut-down threshold that is greater than the turn-on threshold," and "stopping, when the second measurement exceeds the shut-down threshold, the power generation by the power generator." *Id.* at claim 1. Claim 1 offers a particular "how" for autonomously operating a microgrid power generator that addresses the shortcomings of conventional systems. *Id.*

80.    The '270 patent claims are directed to a specific improvement in the physical operation and control of a microgrid power generator, specifically a generator controller (whether implemented via the method and apparatus claims) using a hysteretic droop curve in which the shut-down frequency threshold is set to exceed the turn-on frequency threshold by an amount greater than the expected frequency jump by the generator's own minimum power output (i.e., the expected frequency jump that occurs when the generator is turned on), rather than an abstract idea. This specific technical requirement directly solves the physical hardware problem of generator oscillation caused by the physical characteristics of generators (minimum power requirements and associated frequency jumps) that conventional droop control methods could not address. *See id*. at 1:42-47. Furthermore, it contributes a significant inventive advantage by allowing autonomous operation of a microgrid power generator, using droop control, without unnecessary oscillation. The claimed invention thus provides autonomous, stable generator operation in microgrids, eliminating the hardware degradation and reliability failures characteristic of prior art systems, without unnecessary oscillation. The claimed systems and methods are a specific technical implementation that provides a distinct advantage over conventional systems.

81.    The claimed combination of features was non-conventional in January 2016. The specific use of a hysteretic droop curve having a shut-down frequency that is higher than the turn-on frequency, where the difference between the shut-down frequency and the turn-on frequency is

greater than the expected frequency jump that occurs when the generator is turned on, was not known, let alone widely prevalent or in common use, in 2016. Specifically, the '270 patent recognizes that the initiation of power generation can introduce an undesirable loop in which generation cycles on and off under prior-art control mechanisms. Prior art control methods did not account for the frequency jump caused by a generator's minimum power output, and therefore inherently caused the oscillation instability that the '270 patent resolves.

82.     The claims of the '270 patent are directed to significantly more than merely processing signals. Rather, the claims are directed to a non-conventional controller and control mechanism for a power system that reduces or eliminates unwanted cycling of power generation units, thereby improving the functioning of the claimed power system. The ordered combination of claim 1, for example, of obtaining a grid parameter measurement, comparing it to a turn-on threshold, initiating generation, re-measuring, comparing to a shut-down threshold set higher than the turn-on threshold by a margin exceeding the generator's minimum-power frequency jump, and stopping generation accordingly, was not well-understood, routine, or conventional at the time of the invention. The specific calibration of the hysteretic band to the generator's own physical characteristics, rather than to arbitrary offsets, is the inventive concept that amounts to significantly more than any abstract idea and that directly improves the physical operation, reliability and stability of microgrid power generators. The claimed features were therefore innovative and unconventional as they were not known in the prior art.

## ACCUSED PRODUCTS AND ACTIVITIES

83.     The Accused Products include energy storage facilities that include grid-scale battery energy storage systems ("BESS") and associated control products deployed, operated, controlled, or maintained within the United States by AES. The Accused Products also include, for example, BESS utilized in energy storage facilities with products manufactured, integrated, or supplied by Fluence Energy, including, for example, the Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™,

Sunstack™, and associated Fluence Cube–based multi-inverter platforms governed by Fluence OS. Such energy storage facilities include, but are not limited to, the Luna Storage system and the Lancaster Area Battery ("LAB") system. The Accused Products also include, but are not limited to, the Luna Storage system, and LAB system, Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft). *See, e.g.*, https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

84.    The Accused Products are systems that Defendants have made, used, offered for sale, sold, and/or imported into the United States and grid-scale energy systems that Defendants continue to make, use, offer for sale, sell, and/or import into the United States.

85.    Charts showing exemplary infringing functionality are attached hereto as Exhibits 5-8.

86.    On information and belief, all Accused Products are configured to operate in substantially the same infringing manner with respect to the Asserted Patents asserted against those products.

87.    Upon information and belief, Defendants have had knowledge and notice of the Asserted Patents, and their infringement thereof, since the patent issued. Upon information and belief, each Defendant, as a sophisticated commercial participant in the grid-scale energy systems market, regularly monitors patents related to grid-scale energy systems, including patents related to inverters and grid control, as well as patents from industry-leading and well-known energy solution innovators, including Enphase, and they monitored or were otherwise aware of the Asserted Patents.

88.    Despite having knowledge of the Asserted Patents prior to this Complaint being filed, upon information and belief, Defendants have never undertaken any serious investigation to

form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Defendants have infringed and continue to infringe one or more claims of the Asserted Patents.

89.    Defendants had knowledge of the Asserted Patents and their infringement at least as of May 4, 2026. On May 4, 2026, GridScale notified Defendants of the Asserted Patents and their infringement thereof.

90.    GridScale sent a letter via email and certified mail, return receipt requested, to AES's Andres Gluski (Chairman and Chief Executive Officer) and Paul Freedman (General Counsel and Corporate Secretary) notifying AES of the GridScale patent portfolio, the Asserted Patents by patent number, the technologies covered by these patents, the direct applicability of these patents to AES's modern grid-scale BESS deployments (including AES-operated and AES-affiliated Fluence Gridstack™, Gridstack Pro™, Smartstack™, Ultrastack™, Sunstack™, Fluence Cube-based, and related multi-inverter battery energy storage platforms deployed in U.S. projects such as Luna, Lancaster Area Battery, Petersburg, Spotsylvania Solar Energy Center, Cavalier, and Keydet North), an explanation providing details on how these patents apply to the identified AES products, services and operations, and asked AES to engage in licensing discussions and take a license. AES's return receipts were received on May 11, 2026 (Gluski) and May 13, 2026 (Freedman), confirming mail delivery to AES. AES never responded. Despite receiving this letter, AES continued to knowingly and actively infringe, directly and indirectly, the Asserted Patents with deliberate indifference to and willful disregard of GridScale's patent rights.

91.    GridScale sent a letter via email and certified mail, return receipt requested, to Fluence's Julian Nebreda (President and Chief Executive Officer) and Vincent Mathis (SVP, Chief Legal and Compliance Officer, and Secretary) notifying Fluence of the GridScale patent portfolio, the Asserted Patents by patent number, the technologies covered by these patents, the direct applicability of these patents to Fluence's grid-scale energy storage technology and services,

including Fluence Gridstack™, Gridstack Pro™, Smartstack™, Ultrastack™, Sunstack™, Fluence Cube-based, and related multi-inverter battery energy storage platforms for U.S. grid-scale energy storage systems (including ones with AES), an explanation providing details on how these patents apply to the identified Fluence products, services and operations, and asked Fluence to engage in licensing discussions and take a license. Fluence's return receipt was received on May 11, 2026, confirming mail delivery to Fluence. Fluence never responded. Despite receiving this letter, Fluence continued to knowingly and actively infringe, directly and indirectly, the Asserted Patents with deliberate indifference to and willful disregard of GridScale's patent rights.

92.     Alternatively, to the extent that Defendants avoided or otherwise lacked actual knowledge of the Asserted Patents and their infringement thereof, Defendants were willfully blind. Upon information and belief, to the extent Defendants lacked actual knowledge of infringement, prior to the filing of this action, Defendants deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that they infringed GridScale's patents, and specifically the Asserted Patents, and were therefore willfully blind. Upon information and belief, Defendants lack written policies disseminated to employees regarding monitoring or avoidance of patent infringement by Defendants and lack mechanisms for employees to report patents which they believe Defendants may infringe. Upon information and belief, Defendants and their employees subjectively understood that there was a high likelihood that patents filed on innovations by GridScale read on the Accused Products.

93.     Therefore, upon information and belief, Defendants' infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate, entitling GridScale to increased damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

94.     Upon information and belief, Defendants derive revenue, directly and indirectly, from the activities relating to the Accused Products.

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,796,884**

95.     The allegations set forth in paragraphs 1 through 94 of this Complaint are incorporated by reference as though fully set forth herein.

96.     Pursuant to 35 U.S.C. § 282, the '884 patent is presumed valid.

97.     Defendants infringe the '884 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

98.     On information and belief, Defendants have infringed and continue to infringe one or more claims of the '884 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products, and/or exporting Accused Products.

99.     Defendants make, use, sell, offer for sale, and/or import the Accused Products in this District and elsewhere in the United States, and thus directly infringe the '884 patent.

100.    For example, attached as Exhibit 5 is a chart setting forth a description of at least one example of Defendants' infringement of at least claim 1 of the '884 patent. The descriptions and infringement theories in Exhibit 5 are preliminary and based upon publicly available information. GridScale expects to further develop infringement evidence after obtaining discovery from Defendants in the course of this case. For example, Defendants directly infringe claim 1 via the grid-scale energy systems deployed and operated by AES in the United States, including systems integrated and supplied by Fluence Energy (e.g., Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, Sunstack™, and associated Fluence Cube–based BESS platforms operating in AES U.S. projects such as Luna and Lancaster Area Battery (LAB), Spotsylvania

Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft). *See, e.g.*, https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

101.    Defendants also direct and control customers' use of the Accused Products through, for example, (i) the hardware configuration and software installed on the Accused Products which configure the Accused Products to operate in an infringing manner, (ii) monitoring, maintenance and/or operational support services Defendants provide to customers after deployment, and (iii) technical specifications, operating parameters, and instructions Defendants provide to customers for operating the Accused Products, all of which direct customers to use the Accused Products in an infringing manner.

102.    Defendants have also induced and continue to induce infringement of the '884 patent pursuant to 35 U.S.C. § 271, including at least claim 1, by actively and intentionally encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Products, including by encouraging their customers, operators and end users to use the Accused Products in an infringing manner.

103.    Using the Accused Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 1 of the '884 patent, as described, for example, in Exhibit 5.

104.    Defendants' acts of encouragement include: providing to third parties and intending that third parties, including customers, purchase and use the Accused Products, providing instructions how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States,

including the Commonwealth of Virginia and the Eastern District of Virginia. Furthermore, Defendants have actual knowledge of how the Accused Products operate, including how use infringes the '884 patent. Defendants have undertaken these acts of encouragement with the specific intent that customers use such Accused Products as intended by Defendants in a manner that infringes the asserted claims of the '884 patent.

105. Defendants knowingly and intentionally encourage at least their customers to directly infringe the '884 patent. For example, Defendants provide technical documentation and operational support instructing customers to use the Accused Products in an infringing manner. *See, e.g.*, https://fluenceenergy.com/renewable-energy-storage-knowledge-resources/.

106. Defendants' customers' use of the Accused Products constitutes direct infringement of the '884 patent, as described, for example, in Exhibit 5. Defendants knowingly induce such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least since Defendants' knowledge of their infringement as described above, Defendants know that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

107. Defendants' infringement of the '884 patent is willful, at least since Defendants' knowledge of their infringement as described above.

108. Defendants' acts of infringement have caused and continue to cause damage to GridScale, and GridScale is entitled to recover from Defendants damages sustained as a result of Defendants' infringement of the '884 patent, but in no event less than a reasonable royalty.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 8,279,642

109. The allegations set forth in paragraphs 1 through 108 of this Complaint are incorporated by reference as though fully set forth herein.

110. Pursuant to 35 U.S.C. § 282, the '642 patent is presumed valid.

111. Defendants infringe the '642 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

112. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '642 patent, including but not limited to claim 38, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products, and/or exporting Accused Products.

113. Defendants make, use, sell, offer for sale, and/or import the Accused Products in this District and elsewhere in the United States, and thus directly infringe the '642 patent.

114. For example, attached as Exhibit 6 is a chart setting forth a description of at least one example of Defendants' infringement of at least claim 38 of the '642 patent. The descriptions and infringement theories in Exhibit 6 are preliminary and based upon publicly available information. GridScale expects to further develop infringement evidence after obtaining discovery from Defendants in the course of this case. For example, Defendants directly infringe claim 38 via the grid-scale energy systems deployed and operated by AES in the United States, including systems integrated and supplied by Fluence Energy (e.g., Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, Sunstack™, and associated Fluence Cube–based BESS platforms operating in AES U.S. projects such as Luna and Lancaster Area Battery (LAB), Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft). *See, e.g.,*

https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

115.    Defendants also direct and control customers' use of the Accused Products through, for example, (i) the hardware configuration and software installed on the Accused Products which configure the Accused Products to operate in an infringing manner, (ii) monitoring, maintenance and/or operational support services Defendants provide to customers after deployment, and (iii) technical specifications, operating parameters, and instructions Defendants provide to customers for operating the Accused Products, all of which direct customers to use the Accused Products in an infringing manner.

116.    Defendants have also induced and continue to induce infringement of the '642 patent pursuant to 35 U.S.C. § 271, including at least claim 38, by actively and intentionally encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Products, including by encouraging their customers, operators and end users to use the Accused Products in an infringing manner.

117.    Using the Accused Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 38 of the '642 patent, as described, for example, in Exhibit 6.

118.    Defendants' acts of encouragement include: providing to third parties and intending that third parties, including customers, purchase and use the Accused Products, providing instructions how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States, including the Commonwealth of Virginia and the Eastern District of Virginia. Furthermore, Defendants have actual knowledge of how the Accused Products operate, including how use

34

infringes the '642 patent. Defendants have undertaken these acts of encouragement with the specific intent that customers use such Accused Products as intended by Defendants in a manner that infringes the asserted claims of the '642 patent.

119. Defendants knowingly and intentionally encourage at least their customers to directly infringe the '642 patent. For example, Defendants provide technical documentation and operational support instructing customers to use the Accused Products in an infringing manner. *See, e.g.*, https://fluenceenergy.com/renewable-energy-storage-knowledge-resources/.

120. Defendants' customers' use of the Accused Products constitutes direct infringement of the '642 patent, as described, for example, in Exhibit 6. Defendants knowingly induce such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least since Defendants' knowledge of their infringement as described above, Defendants know that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

121. Defendants' infringement of the '642 patent is willful, at least since Defendants' knowledge of their infringement as described above.

122. Defendants' acts of infringement have caused and continue to cause damage to GridScale, and GridScale is entitled to recover from Defendants damages sustained as a result of Defendants' infringement of the '642 patent, but in no event less than a reasonable royalty.

123. To the extent required, GridScale and its predecessors-in-interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '642 patent, and GridScale is entitled to

damages for Defendants' past infringement.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 8,842,454

124. The allegations set forth in paragraphs 1 through 123 of this Complaint are incorporated by reference as though fully set forth herein.

125. Pursuant to 35 U.S.C. § 282, the '454 patent is presumed valid.

126. Defendants infringe the '454 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

127. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '454 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products, and/or exporting Accused Products.

128. Defendants make, use, sell, offer for sale, and/or import the Accused Products in this District and elsewhere in the United States, and thus directly infringe the '454 patent.

129. For example, attached as Exhibit 7 is a chart setting forth a description of at least one example of Defendants' infringement of at least claim 1 of the '454 patent. The descriptions and infringement theories in Exhibit 7 are preliminary and based upon publicly available information. GridScale expects to further develop infringement evidence after obtaining discovery from Defendants in the course of this case. For example, Defendants directly infringe claim 1 via the grid-scale energy systems deployed and operated by AES in the United States, including systems integrated and supplied by Fluence Energy (e.g., Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, Sunstack™, and associated Fluence Cube–based BESS platforms operating in AES U.S. projects such as Luna and Lancaster Area Battery (LAB), Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing

Dominion Energy), and Keydet North (servicing Microsoft). *See, e.g.*, https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

130. Defendants also direct and control customers' use of the Accused Products through, for example, (i) the hardware configuration and software installed on the Accused Products which configure the Accused Products to operate in an infringing manner, (ii) monitoring, maintenance and/or operational support services Defendants provide to customers after deployment, and (iii) technical specifications, operating parameters, and instructions Defendants provide to customers for operating the Accused Products, all of which direct customers to use the Accused Products in an infringing manner.

131. Defendants have also induced and continue to induce infringement of the '454 patent pursuant to 35 U.S.C. § 271, including at least claim 1, by actively and intentionally encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Products, including by encouraging their customers, operators and end users to use the Accused Products in an infringing manner.

132. Using the Accused Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 1 of the '454 patent, as described, for example, in Exhibit 7.

133. Defendants' acts of encouragement include: providing to third parties and intending that third parties, including customers, purchase and use the Accused Products, providing instructions how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States, including the Commonwealth of Virginia and the Eastern District of Virginia. Furthermore,

Defendants have actual knowledge of how the Accused Products operate, including how use infringes the '454 patent. Defendants have undertaken these acts of encouragement with the specific intent that customers use such Accused Products as intended by Defendants in a manner that infringes the asserted claims of the '454 patent.

134. Defendants knowingly and intentionally encourage at least their customers to directly infringe the '454 patent. For example, Defendants provide technical documentation and operational support instructing customers to use the Accused Products in an infringing manner. *See, e.g.*, https://fluenceenergy.com/renewable-energy-storage-knowledge-resources/.

135. Defendants' customers' use of the Accused Products constitutes direct infringement of the '454 patent, as described, for example, in Exhibit 7. Defendants knowingly induce such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least since Defendants' knowledge of their infringement as described above, Defendants know that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

136. Defendants' infringement of the '454 patent is willful, at least since Defendants' knowledge of their infringement as described above.

137. Defendants' acts of infringement have caused and continue to cause damage to GridScale, and GridScale is entitled to recover from Defendants damages sustained as a result of Defendants' infringement of the '454 patent, but in no event less than a reasonable royalty.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 10,516,270

138. The allegations set forth in paragraphs 1 through 137 of this Complaint are incorporated by reference as though fully set forth herein.

139. Pursuant to 35 U.S.C. § 282, the '270 patent is presumed valid.

140. Defendants infringe the '270 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

141. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '270 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products, and/or exporting Accused Products.

142. Defendants make, use, sell, offer for sale, and/or import the Accused Products in this District and elsewhere in the United States, and thus directly infringe the '270 patent.

143. For example, attached as Exhibit 8 is a chart setting forth a description of at least one example of Defendants' infringement of at least claim 1 of the '270 patent. The descriptions and infringement theories in Exhibit 8 are preliminary and based upon publicly available information. GridScale expects to further develop infringement evidence after obtaining discovery from Defendants in the course of this case. For example, Defendants directly infringe claim 1 via the grid-scale energy systems deployed and operated by AES in the United States, including systems integrated and supplied by Fluence Energy (e.g., Fluence Gridstack™, Gridstack Pro™, Ultrastack™, Smartstack™, Sunstack™, and associated Fluence Cube–based BESS platforms operating in AES U.S. projects such as Luna and Lancaster Area Battery (LAB), Spotsylvania Solar Energy Center (servicing Apple, Akamai, Etsy, and Microsoft), Cavalier (servicing Dominion Energy), and Keydet North (servicing Microsoft). *See, e.g.,*

39

https://www.aes.com/sustainability-impact/people-communities/projects/luna-and-lab-energy-storage; https://ir.fluenceenergy.com/news-releases/news-release-details/fluence-ecosystem-supplies-908-mwh-battery-based-energy-storage.

144.    Defendants also direct and control customers' use of the Accused Products through, for example, (i) the hardware configuration and software installed on the Accused Products which configure the Accused Products to operate in an infringing manner, (ii) monitoring, maintenance and/or operational support services Defendants provide to customers after deployment, and (iii) technical specifications, operating parameters, and instructions Defendants provide to customers for operating the Accused Products, all of which direct customers to use the Accused Products in an infringing manner.

145.    Defendants have also induced and continue to induce infringement of the '270 patent pursuant to 35 U.S.C. § 271, including at least claim 1, by actively and intentionally encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Products, including by encouraging their customers, operators and end users to use the Accused Products in an infringing manner.

146.    Using the Accused Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 1 of the '270 patent, as described, for example, in Exhibit 8.

147.    Defendants' acts of encouragement include: providing to third parties and intending that third parties, including customers, purchase and use the Accused Products, providing instructions how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States, including the Commonwealth of Virginia and the Eastern District of Virginia. Furthermore, Defendants have actual knowledge of how the Accused Products operate, including how use

infringes the '270 patent. Defendants have undertaken these acts of encouragement with the specific intent that customers use such Accused Products as intended by Defendants in a manner that infringes the asserted claims of the '270 patent.

148.   Defendants knowingly and intentionally encourage at least their customers to directly infringe the '270 patent. For example, Defendants provide technical documentation and operational support instructing customers to use the Accused Products in an infringing manner. *See, e.g.*, https://fluenceenergy.com/renewable-energy-storage-knowledge-resources/.

149.   Defendants' customers' use of the Accused Products constitutes direct infringement of the '270 patent, as described, for example, in Exhibit 8. Defendants knowingly induce such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least since Defendants' knowledge of their infringement as described above, Defendants know that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

150.   Defendants' infringement of the '270 patent is willful, at least since Defendants' knowledge of their infringement as described above.

151.   Defendants' acts of infringement have caused and continue to cause damage to GridScale, and GridScale is entitled to recover from Defendants damages sustained as a result of Defendants' infringement of the '270 patent, but in no event less than a reasonable royalty.

## 35 U.S.C. § 287 COMPLIANCE

152.   To the extent required, GridScale and its predecessors-in-interest have satisfied the

requirements of 35 U.S.C. § 287(a) with respect to the Asserted Patents. GridScale does not make, sell, or offer for sale any products embodying the inventions claimed in the Asserted Patents. Upon information and belief, no predecessor-in-interest made, sold, or offered for sale any products embodying the inventions claimed in the Asserted Patents. GridScale is entitled to damages for Defendants' past infringement.

**JURY TRIAL DEMAND**

GridScale demands a trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, GridScale respectfully requests that this Court:

A.      Enter judgment that Defendants have infringed and continue to infringe, directly and indirectly through inducement, one or more claims of each Asserted Patent, and that the Asserted Patents are valid and enforceable;

B.      Enter judgment that Defendants' acts of infringement are willful;

C.      Enter an order, pursuant to 35 U.S.C. § 284, awarding GridScale monetary relief in an amount adequate to compensate for Defendants' infringement of the Asserted Patents, in an amount to be determined at trial, but not less than a reasonable royalty, as well as pre- and post-judgment interest and costs and enhanced damages for Defendants' willful infringement of the Asserted Patents;

D.      Enter an order that Defendants pay GridScale ongoing royalties in an amount to be determined for any infringement occurring after the date that judgment is entered;

E.      Enter an order, pursuant to 35 U.S.C. § 285, declaring this to be an exceptional case and thereby awarding to GridScale its reasonable attorneys' fees and costs; and

F.      Enter an order awarding to GridScale such other and further relief, whether at law or in equity, that this Court deems just, equitable, and proper.

42

Dated: May 22, 2026

Respectfully submitted,

*/s/ Blair M. Jacobs*
Blair M. Jacobs (VA Bar No. 32010)
bjacobs@bsfllp.com
Christina A. Ondrick (VA Bar No. 45736)
condrick@bsfllp.com
John S. Holley (*pro hac vice forthcoming*)
jholley@bsfllp.com
John Wittenzellner (*pro hac vice forthcoming)*
jwittenzellner@bsfllp.com
Julia Peoples *(pro hac vice forthcoming)*
jpeoples@bsfllp.com
Boies Schiller Flexner LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

*Attorneys for Plaintiff GridScale Solutions, LLC*

43